First case for argument this morning is 162741 Parallel Networks v. SG Interactive. Ready whenever you are, Mr. Stillman. Good morning. May it please the court, my name is Greg Stillman. I'm here on behalf of Parallel Networks asking the court to reverse an order of summary judgment of non-infringement against the Parallel Networks 145 patent. As you know, the 145 patent describes a distributed cash network designed in large part to solve some of the problems of broadband width. The trial court's made two fundamental errors in our view. First, by its claim construction itself and then by its subsequent interpretation of its own claim construction. Now, as a preliminary matter, I certainly realize that the court's recent decision in the Global Connect case has a material impact upon my claim should have been accorded its ordinary meaning and that there was no evidence in this case that either the applicant was attempting to be their own lexicographer or that there had been any knowing disclaimer during the course of prosecution. As you know, historically in our cases, the argument goes the other way. District courts are often challenged to criticize for not considering a claim. Exactly. And I think part of the problem here, though, is quite frankly the claim construction that the court ultimately came up with didn't really advance the ball, didn't really do anything to explain the But arguably he did. The construction was sufficient for purposes of determining whether or not there's infringement. Well, it was in his mind, right? Because ultimately he took that claim construction, as you know, and made a decision that that imposed a limitation on the claims that one practicing this invention for whatever reason was not able to download the entire content of the file that was being distributed to the cash network. That's the problem when you really boil this case down to its nub. And the reality is that if you look at the patent, you see you simply see no such limitation. And in fact, to the contrary, you'll see consistently some very permissive language. There's no question, but these claims are written very broadly and that each time you see the embodiments described in this patent, you'll see use of the words may throughout. There is no limitation or suggestion. And I don't know how one could even look if you rely entirely upon the summary of invention portion of the of the patent, which the trial court clearly did, whether that leads you to the inevitable conclusion that a the entire file. Is that really what the district court was focusing on? That is, I guess I took what the district court to be saying to be something a little bit more like this. Allocating when reallocating storage among, let's say, three people requires some sharing of resources so that not everybody has all of it, because if everybody has all of it, then you're not sharing anything and there's nothing to reallocate so that it may well be that one. That is, I don't think the district court was saying no single one can have all of it. But what can't be the case is that all of them have all of it. And that's what is in the accused products. And nobody ever gives anything up for storage. And of course, what typically happens in the context of the downloading of content in the context of this patent is that once someone achieves 100 percent of the content, they exit the swarm. They exit because essentially for all intents and purposes, they've acquired the content and so they exit the swarm. But that, again, confuses the method and system claims that are described in Claims 1 and 15 in particular, which are really nothing more than a method and system for the distribution of content. The ultimate result of whether a single peer acquires all of the content or not is really kind of irrelevant to what the claims are describing here. The claims are really describing a method of reallocation, which occurs once that have message is sent. And as you know, there was some dispute in the record about whether the defendants use this rarest first algorithm or not. But ultimately, the trial court decided that it did not matter for his purposes. But once they implement that algorithm, there is a reallocation that's described in the patent. But is it a reallocation of storage or a change in either of two things? Which pieces you seek first as opposed to second, and second, where you seek them from? Neither one of which feels to me, and I think maybe the district court said this, like a reallocation of storage. Well, it's a reallocation of content. And to some extent, content and storage are, in this context, almost the same thing. But at the end of the day, what you're describing in this patent is simply nothing more than a reallocation of content based upon this rarest first algorithm. The end result of an individual peer acquiring 100% of the content of the game or not is really not relevant. What's relevant is the allocation process that's going on throughout the reallocation mechanism. In the accused products, does any of the peers shed any content from its own storage at any given time? Yeah, there's nothing in the patent that says that a peer cannot give up content. In fact, if you look at figure five in the patent, you can see pretty clearly that different content is going to be shared by different peers at different times. And so the idea that there's nothing in the patent itself that says that a peer cannot give up content. And once again, I think that's the point here. The point is that that limitation is simply not found anywhere in the patent. Now, the court's ruling is based upon essentially three premises that, in our view, were wrong. First is description and understanding of the summary of invention that each peer is associated with a content portion. Second, that if each peer had all of the data, the inventor would face the same problems that existed in the prior art. And three, the phrase among the peers in the claim precludes a single peer from downloading all of the content. Now, as we've said in our brief, there's absolutely nothing in these claims that precludes a peer from downloading the entire content or, in this case, the entire game. First of all, the court and the defendants seem to be making much of the fact that the clients always intend to download the entire file. As a practical matter, under the patent, why should that matter? To accomplish the goal, they're still required to acquire pieces through the rarest first algorithm. And more importantly, if you look at the specifications itself, you'll see that it's full of permissive language. The court's construction is heavily influenced by the section in the summary of invention that purports to relate to independence claims one and two. And that paragraph merely states that the second contact portion is distinct from the first content portion. This paragraph, again, is merely describing an embodiment and should not certainly limit the scope of the claims. But more importantly, merely drawing a distinction between the first portion and the second portion doesn't mean that a peer cannot download the entire content. If you look at the specifications, consider all of this permissive language. Consider the section of the specification referencing claim shares and primary distributions, column 15, lines 27 through 48. It is littered with permissive language. The primary distribution of cash may be determined by the actual primary distribution of cash may comprise a simple fractional split. A particular client which reboots may receive a smaller cash than a client which has historically high uptime. Nothing in these claims precludes a client from inquiring the current content of the file. And most important thing for the court to understand here is that these are system and method claims. What is happening with respect to any individual in this system is not so relevant as to what is happening in the system. This is a cash community. And the patent describes the interactions among the peers, not just a single peer. And these interactions in the patent include the interactions of the peers in the swarm. So you have the sending of have messages. You have the handshake process. You have the exchange of bit field messages. You have the piece selection process in the case of accused games, a rarest first algorithm. And whether an individual peer powers down his computer, for example, before downloading 100% of the game is really irrelevant. He's still playing a role. He's adding value to the swarm by providing content. Now, the court's based its entire ruling on that irrelevant and false premise that the goal of any given peer is ultimately to obtain 100% of the game package. But the fact remains that the reallocation limitation is met in the accused system when it reallocates in response to a client joining the swarm. Now, I'd like to close this portion of my argument with one final word. Not so much about patent law, but more about the federal rules and about the Seventh Amendment here. You had two highly skilled people in the art of this patent testifying about details of these claims that were in opposite in almost every material way. And if you don't read anything else in this case, I encourage you to read the rebuttal report of Dr. Rare, which is found in the appendix, I think, at page 1307. And he will lay out for you the details in which these two experts disagreed on virtually everything. Now, you know better than I that these claims are to be read in the light of a person skilled in the art, not in the light of an Article III judge. And at the end of the day... I'm sorry, where in the appendix is... I think it's on page 1307 of the appendix. I don't think we have that page. You may have lots of numbered material that didn't get cited and therefore doesn't make it into the bound thing we get. Okay. Well, in any event, if you could have looked at Dr. Rare's testimony, you would see that he disagreed with Dr. Claypool, two computer scientists, in virtually every respect. And at the end of the day, this was a classic case for a jury to resolve. And I'll reserve the rest of my time for rebuttal. Thank you. Thank you. Mr. Landis. Good morning, Your Honors. May it please the Court, Todd Landis on behalf of the appellees. I think I'd like to start the discussion with a question that Judge Toronto asked of my colleague about the accused systems. And whether or not in the accused systems, does any person participating in the swarm ever shed any content? And the answer to that question is no. No person will ever shed content.  And what's most important to these claims at issue here is that everybody that enters the swarm in the accused systems must enter and have the exact same amount of storage set aside. No one can ever use less. Everyone must have that amount. And that's why the accused systems are different than the claimed invention. The claimed invention is not about downloading content. It's about sharing storage. Sharing cache storage. Distributing that amongst the group. That's why this patent's title is about a distributed data caching system and method. The claims are directed to sharing storage responsibilities. In the accused systems, there is no sharing of storage responsibilities. Everyone must have the room for everything. And if you don't, you're not allowed in. No one ever sheds any content. And I think this is an important point because the claims that we are talking about here are for a distributed data caching system and a very specific scenario within such a system. And it's a scenario where you have an existing community and now somebody new wants to join it. What happens to the cache storage when that event occurs? That is what these claims are entirely about. And at that moment in time, what the claims tell us is you're going to reallocate that cache storage among the peers that now exist in the group, including the new client joining. And when the court looked at this and was discussing with the attorneys, myself being one of them, during the hearing, we understood that you can't move the storage. The storage is fixed in everybody's computer. So how do you express what this claim term means? And that's why the court chose to do it in terms of portions of content to be cached. Because that's what you can move around. By reallocating the amount of content that each peer will get, you have, in essence, reallocated their cache storage. They may have to use more, they may have to use less, depending upon how you give it out to them. But the patent is consistent and repeatedly says that when you do this allocation, each person is going to get some but not all the content. And that's how the court came to that conclusion. When you look at every example in the patent, not only the discussion of the actual claim, which occurs in column 21 of the patent, but the discussion of all the other embodiments. When you have a single, what the patent tends to refer to as a distribution, but a reallocation, when you have that single reallocation, each of the peers is getting a tiny bit of the content. My colleague referenced figure 5. And if you look at figure 5, which I think is at appendix 29, when you look at figure 5, it's important that when you look at each of those distributions in figure 5, the redundancy occurs because you're stacking distributions. What's happening in figure 5? Figure 5, Your Honor, is about how the system will allow for redundancy. It's trying to take care of an issue where if you have one peer whose computer seems to always reboot or it has a lot of downtime, they want to make sure that the system has a redundancy built in so that the content is still available to the community. But where they don't build the redundancy in is in each of the individual distributions. If you look at the primary, secondary, and alternate secondary, none of the peers are getting the same content. It's an exclusive distribution on the horizontal. You get the redundancy on the vertical. What we're talking about in these claims is the horizontal. That's what these claims are about. When you bring a new peer into the community, you reallocate, you spread it around, everyone gets some but not all without overlap. If you want the overlap to be built in once the new community exists, then you can perform figure 5. But the claims are not about figure 5. The claims are about that, I refer to it as that primary distribution. When a new peer comes in, we're going to see what the content is, we're going to see how much storage capacity we now have, and we're going to start spreading it around. Everyone can share. No one has to take on too much of the burden. When the court interpreted the reallocating step as reallocating the portions of the content to be stored by each peer's cache storage, he was accounting for this very event. What the patent says it's about. In fact, when the reallocating limitation was actually put into the claim, the applicant pointed the patent office to the portion of the specification that supported the limitation. That was in column 21 of the patent, lines 7 through 13. When you look at column 21, lines 7 through 13, this is where it says that when a new peer joins, a dynamic cache application will reallocate and provide the new client with a subset of the content, a portion of the content. The summary of the invention is by far not the only place that supports the district court's claim construction. Column 21 fully supports it, figure 6, figure 10, and also column 25, lines 21 through 25, which is at appendix 49. All of those places support the conclusion that this claim is about reallocating content storage by giving each of the participants in the community a piece of the content to store, but not all the content. Would it matter if the system gave some all as long as it gave some less than all? Your Honor, I think it would matter. I certainly would say that the patent doesn't contemplate, as far as I can tell in reading the patent, a system where in that initial distribution, that initial allocation, that the peers share responsibility for the same pieces of content. In every example in the patent, every place in the patent that they talk about how it's split up, it's always that each peer is getting different pieces of content and there's no overlap within that distribution. I think they did that for a reason, because they contemplated figure 5. They contemplated having secondary and tertiary potential distributions. You're talking about it more as a claim construction question. Let me ask the application infringement version of the question. Suppose that this system allowed some peers to get all, but not all peers to get all. Would there be a tribal infringement case here, or do we not know, or what? I don't believe there still would be a tribal infringement case, Your Honor, because I think the patent still would require some reallocation. In the situation you're describing, there'd still be a reallocation where some might get all, but others would not get all. In the system at issue here, everyone has to have the exact same amount of cache storage. No one can have a lesser amount. If the game is 20 gigabytes in size, everyone coming into that swarm has to have 20 gigabytes set aside for the game. The software checks that before it starts downloading, right? Yes, Your Honor. Yes, it does. If I can find my site, I'll find the site for you. Actually, the declaration of the person who wrote the software is in the appendix. There's a statement, and it wasn't disputed by the appellant in this case. It checks before you can even enter the swarm. Once you're in the swarm, you never lose. You never can use less. You never can set aside some. You're going to have to keep that set aside until either you leave the swarm for a reason or you get all the content, and it's filled up. Your Honor, I think that the district court's analysis in this case was, I think he followed what this court has told him to do time and time again. He looked at the claim language. He understood there was a dispute as to the scope of that claim language. He read the claim language in light of the specification in the prosecution history and came to the conclusion that the best way to describe what the reallocating term means is with the construction that he rendered in the case. And by doing so, he then examined the accused systems and determined that the accused systems simply don't reallocate cash storage. There is no reallocation that occurs because everyone has to have the exact same amount of storage. And by doing so, no one disputed that fact. There were no disputes of material fact, and so summary judgment was appropriate in this case. And we believe that the district court, in both claim construction and with respect to summary judgment, got that right. Unless Your Honor has any more questions, that's all I have. Thank you. Thank you. I'd like briefly to address this whole question about whether the relevancy of whether every individual player downloads 100% of the game. Dr. Ayer testified at length about this, and he disagreed vehemently with the idea that, first of all, that Parallel stipulated that the goal of each client was to successfully download and store 100% of the game package. But he makes this point. However, just because the goal of each client in the Pando system was to obtain the entire package, it was not necessarily true that each client would download and store 100% of the video games. In some cases, the user who requested the download, for example, would change his mind and never return to the swarm. He might, for example, decide the package takes up too much space on his computer. He might turn his computer off and come back and do the rest later. But he is still contributing to the swarm. He's still providing an opportunity to share data and reallocation under this patent. The ultimate result of whether or not an individual gamer downloads 100% of content is not relevant to the claims of this patent, and that's our point, pure and simple. This is a reallocation patent, and the reallocation limitations are met quite plainly. That testimony was clear in Dr. Rare's declared sworn testimony. It is met when this reallocation occurs, when a person gets the have message, and as soon as they join the swarm because of that Rare's first algorithm, the content of what they have is now immediately reallocated. That's the reallocation limitation. What ultimately an individual member of the peer does with respect to the swarm is not relevant to the claims of this patent. At the end of the day, if you look at the summary of invention, which is what the trial court looked at and relied upon in its conclusion that 100% of the content could not be downloaded, it simply doesn't say that. It distinguishes between the first portion and the second portion, but there is no unambiguous statement anywhere in this patent that says that users of this system are unable to download 100%. But our point, and the point that I want to leave you with this morning, is that that is irrelevant to the reallocation system. Thanks very much. I thank both sides of the case.